1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ROBERTO SALDANA, JR.,                    Case No.   1:21-cv-01733-KES-HBK (HC)

12                    Petitioner,              FINDINGS AND RECOMMENDATIONS TO
                                               DENY PETITION FOR WRIT OF HABEAS
13           v.                                CORPUS AND DECLINE TO ISSUE
                                               CERTIFICATE OF APPEALABILITY [1]
14    M.E. SPEARMAN, Warden,
                                               FOURTEEN-DAY OBJECTION PERIOD
15                    Respondent.

16

17

18    **I.      STATUS**

19           Petitioner Roberto Saldana, Jr. ("Petitioner" or "Saldana"), a state prisoner, is proceeding

20    pro se on his Amended Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on

21    February 2, 2022.  (Doc. No. 9, "Petition").  Petitioner challenges convictions after a jury trial for

22    second degree murder, attempted murder, conspiracy to commit home invasion robbery,

23    attempted home invasion robbery, being a felon in possession of a firearm, and possession of

24    ammunition, along with various firearm and gang enhancements.  (Case No. PCF331992A).

25    (Doc. No. 16-1 at 2077; *see id.* at 447-56).[2]  The Tulare County Superior Court sentenced

26    ─────────────────────
      [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
27    (E.D. Cal. 2022).

      [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
28    and Electronic Case Filing ("CM/ECF") system.

                                              1

1    Petitioner to 56 years to life in prison, consisting of 15 years to life for second degree murder,

2    plus 1 year for the corresponding knife enhancement; a consecutive term of 25 years to life for

3    criminal street gang conspiracy to commit murder; and a consecutive term of 15 years to life for

4    conspiracy to commit home invasion robbery.  (Doc. 16-1 at 2078-79; *see id.* at 494-97).

5            On appeal, the Fifth Appellate District Court remanded to the trial court to correct errors

6    in the abstract of judgment, but otherwise affirmed Saldana's conviction.  (Case No. F076842).

7    (Doc. No. 16-1 at 2111).  On September 9, 2020, the California Supreme Court summarily denied

8    Saldana's petition for review (Case No. S263871).  (*Id.* at 2192).

9            The Petition presents the following (restated) grounds for relief:

10           (1) The trial court abused its discretion and displayed judicial bias
             when allowing the consolidation of three separate matters.

11

12           (2) Petitioner's trial counsel was ineffective for failing to move to
             strike coconspirator hearsay evidence; failing to request
             modification of a jury instruction regarding such evidence; and

13           failing to use closing arguments to urge the jury to reject the
             coconspirator hearsay statements.

14

15           (3) There  was insufficient evidence to support that members of
             Petitioner's gang engaged in a pattern of criminal activity prior to
             2008.

16

17   (*See* Doc. No. 9 at 5-8.  Respondent filed an Answer (Doc. No. 19), arguing Petitioner was not

18   entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 16,

19   16-1).  Petitioner filed a traverse.  (Doc. No. 28).  This matter is deemed submitted on the record

20   before the Court.  After careful review of the record and applicable law, the undersigned

21   recommends the district court deny Petitioner relief on his Petition and decline to issue a

22   certificate of appealability.

23   **II.      GOVERNING LEGAL PRINCIPLES**

24       **A.      Evidentiary Hearing**

25           In deciding whether to grant an evidentiary hearing, a federal court must consider whether

26   such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

27   would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

28   (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

2

1    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*  Here,

2    the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the

3    pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

4    hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

5    **B.    ADEPA General Principles**

6    A federal court's statutory authority to issue habeas corpus relief for persons in state

7    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

8    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

9    first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

10   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

11   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

12   the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

13   136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

14   claim adjudicated on the merits, but only if the adjudication:

15   
16   (1) resulted in a decision that was contrary to, or involved an
     unreasonable application of, clearly established Federal law, as
     determined by the Supreme Court of the United States; or

17   
18   (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
     State court proceeding.

19   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

20   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

21   "Clearly established federal law" consists of the governing legal principles in the

22   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

23   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

24   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

25   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

26   governing law set forth by Supreme Court case law; or (2) reached a different result from the

27   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

28   12, 16 (2003).

3

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies.") (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has cleared both tests." *Id*. at 134.

As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

4

an "adjudication on the merits" in state court.  An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S. at 98.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id*. at 99.  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  *Id*. at 99-100.  This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do."  *Id*. at 1196.

## III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal.  A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### STATEMENT OF THE FACTS

#### *The Norteño Criminal Street Gang in Tulare County*

> A gang expert, Officer John Moreno, testified for the prosecution that Lindsay North Side (LNS) is a Norteño criminal street gang that is primarily located within the city of Lindsay. While the

5

number of LNS gang members was fluid, it was thought to be between 50 and 75 at the time of trial. The North Side Lindsay (NSL) gang and LNS gang were "interchangeable" and, at the time of the murder, LNS was an active gang in Lindsay. Norteños and Northerners are part of the Nuestra Familia prison gang, a very structured organization. The Sureños are the primary rival of the Norteños, and "scrap" is a derogatory term for a Sureño.

The expert testified that the primary activities of the LNS include, but are not limited to, murder, attempted murder, arson, drug trafficking, extortion, vandalism, driveby shootings, assault with deadly weapons, assaults, and intimidation of victims and witnesses.

The expert related details of two predicate offenses committed by NSL gang members in August of 2004 and March of 2005.

The expert opined, based on appellant's prior contacts with law enforcement, association with other gang members, commission of gang-related crimes, wearing gang-related clothing, and self-admission, that appellant "is and was an active LNS Norteño member." Over the course of trial, others identified appellant as an LNS gang member as well. Appellant's moniker or nickname was "Grinch."

***2008 Murder of Martin Ibarra (Count 1)***

In July 2008, Jose Flores, Jr., Phillip Peyron, and appellant worked together at Tulare Frozen Foods in Lindsay. Around 2:00 a.m. on July 20, Flores, Peyron, appellant, and Ramon "Shorty" Torres were in Flores's apartment, drinking and doing drugs. Neither Flores nor Peyron had hung out with appellant prior to that night.

At the time, Flores was an active Norteño gang member and a lieutenant in the gang. Peyron had been affiliated with the Northerners when he was younger but was not an active gang member at the time. Flores testified that appellant was a Northerner.

At some point, Flores went out onto his balcony and saw a "[y]oung kid," later identified as Martin Ibarra, walking down the street. Flores described the person as "harmless." Flores testified that Ibarra was looking into people's cars "to come up with change" to "support his habit." Flores had seen Ibarra do this previously. Flores went inside to get another beer as appellant and Torres walked onto the balcony. Flores then heard appellant say someone was breaking into his car; Flores went onto the balcony and appellant and Torres ran out of the apartment. Flores and Peyron then also left the apartment and went outside.

Flores heard appellant yell that Ibarra was a "[f**]king scrap," and that the two had had a prior "confrontation." Flores had heard that there were Southerners in the area, but he did not know them.

Appellant put his arm around Ibarra's neck and Ibarra yelled that he was not a Southerner and screamed for help. Flores told appellant

Ibarra was not a Southerner and tried to stop him. But appellant continued to hold Ibarra around the neck and then stabbed him twice with a large kitchen knife from Flores's apartment. Ibarra fell to the ground, bleeding and asking for help, but appellant ran toward the apartment.

Flores, who was on parole and had two previous strikes, did not call the police or call for an ambulance. Instead, he said he was "focused" on trying to get the knife back from appellant but could not find him. Flores yelled at Peyron to get rid of the block of knives that were in the kitchen. Peyron grabbed the block of knives and Flores's girlfriend put the block in a backpack. Peyron took the backpack and walked home.

Flores testified that a killing by a gang member is supposed to be "authorized," but "some people just take it upon themselves to do it." According to Flores, this killing was not authorized, but appellant "just did this all by himself."

Officers found Ibarra lying dead in the gutter. A backpack containing a knife block and kitchen knives was found against a wall surrounding the apartment complex. The knife used to stab Ibarra was not found.

At about 8:00 p.m. on the evening of the murder, Flores talked to Police Chief Chris Hughes. Flores told Chief Hughes he saw "two guys" by his car and he thought they were stealing things, and when he went downstairs, he saw Torres holding a stereo with wires. Flores told Chief Hughes that he thought Ibarra "kind of brought it on himself" for being a Southerner in that area. Flores identified appellant as the assailant and told Chief Hughes that the knife used in the attack had come from his apartment. He also said that they hid the knife block because he was scared and on parole.

Over five years later, John Maduena, who was an LNS gang member and in custody at the time, told jail deputies that he had information about a homicide in Lindsay. Maduena told detectives that appellant, who had just returned from Arizona, had admitted to stabbing "a paisa over there by the apartments." However, at trial, Maduena testified that detectives had "coached" him on what to say and "a lot of stuff was made up."

Based on a hypothetical question that tracked the facts in the case, the gang expert opined that the killing promoted and benefitted the gang by instilling fear in the rival gang so that it could keep control of its territory. The expert explained the use of force and fear made the gang stronger, which was another benefit to the gang.

The expert testified that the presence of other suspected gang members or associates at the killing would bolster his opinion that the crime promoted and benefitted the gang. The expert explained that other gang members and associates could verify what occurred, and the presence of other gang members benefitted the gang by making the gang appear stronger, which assisted the gang in committing future crimes and recruiting members.

7

***2015 Conspiracy to Commit Home Invasion Robberies (Counts 5–10)***

Corporal Jeremy Rose and Officer Michael Szatmari testified that, due to an increase in gang violence in Tulare County in late 2014 and 2015, several law enforcement agencies conducted a joint wiretap investigation, named Operation Red Sol, into the activities of the Norteño criminal street gang. During the investigation, the wiretaps were narrowed to three target telephones, and personal surveillance of the individuals on the wiretaps.

The wiretaps and surveillance relevant to the crimes charged in this case occurred on August 24, and 25, 2015, and involved various high ranking Norteño gang members: Jose Martinez, Pedro Sanchez, brothers Emmanuel and Cervando Avalos (we refer, at times, to the brothers by their first names to avoid confusion), Luis Corona, Valentine Ornelas, Rigoberto Benavidez, Joe Hinojosa, and Pedro Lopez. Transcripts of the calls were given to the jurors. The text messages were read verbatim from the officer's reports.

The communications began on August 24, 2015, at 12:40 p.m., when Emmanuel called Hinojosa and told him they had a paying "job" for him, and he would be at the "pad" in 40 minutes to tell him about it. Emmanuel told Hinojosa he already had a couple of people but wanted to see if "you and Grinch [appellant] wanted to back him up." Hinojosa told Emmanuel he was not interested, but Emmanuel encouraged Hinojosa to call Grinch and see what he said.

A few minutes later, Sanchez called Lopez and asked if he was going to be in the Visalia area and had time "to hook up," as something "came up" and he wanted to "run it by [him]." Lopez said he would be heading that way soon.

Sanchez then sent a text to Cervando asking if he wanted to "mob, Visa" – "mob" typically refers to going somewhere to engage in criminal activity and "Visa" is short for Visalia.

At 3:07 p.m., Benavidez called Ornales and asked if they had "any homies" by "Pinkham." Ornales said that he did not think so. Benavidez said, "[T]hese fools are gonna f[**]kin' bust a move tonight" and need somewhere to get "suited." Benavidez then told Ornales he would talk to him soon about "details" and needed somewhere in the area to get dressed. Ornales said he did not know anyone in the area but would "look around." Benavidez told Ornales, "They're coming out of their jurisdiction," and after they "complete the mission, they're gonna give us a cut." Ornales said he would find a house.

At 3:21 p.m., Sanchez called Emmanuel and asked if he was ready and to tell Cervando to call a number he would text him to get "exact directions" and that "he's gonna be there right at seven."

Sanchez and Benavidez then exchanged a couple of text messages about setting up a meeting to discuss "a good lick [robbery] and a

great opportunity."

Sanchez also sent Emmanuel a text that "it is come-up [easy score] and need to know ASAP if they are in or out" and that he had "a good job for Grinch and Hammer [Hinojosa]. They'll be a part of the team. I'll be at your pad in 40 minutes to explain the details," and he told Emmanuel to contact them. Emmanuel replied, "okay, got it."

Emmanuel forwarded his text message with Sanchez to Hinojosa and sent Hinojosa a text that said "get ahold of Grinch. See if he's in."

About 3:55 p.m., officers conducting surveillance saw Emmanuel's white Ford Explorer parked in front of his house. Emmanuel, Cervando and Corona lived together in the same house on Samoa Street.

A short time later, Sanchez arrived at the house driving a black GMC Envoy. Almost immediately, a dark-colored Honda also arrived with four people. They all got out of their vehicles and talked.

At 4:33 p.m., Emmanuel called Corona and asked who he wanted to "take" with him. Corona said he was working on it, and Emmanuel told him Sanchez wanted the names "within an hour." At 4:41 p.m., Emmanuel sent a text message to Sanchez that Corona was "going for sure," and he would get the second body shortly. A minute later, when Corona told Emmanuel he could not find someone, Emmanuel said he would.

Various messages were sent back and forth stating Hinojosa and Corona were getting "haircuts." Emmanuel then sent a message to Sanchez asking whether "they" needed anything else "besides haircuts, long-sleeve black T[s]." At 5:18 p.m., Sanchez sent a message to Emmanuel that said, "handguns," and Emmanuel wrote back, "okay got it" and "both will have all black handguns."

At 6:03 p.m., Benavidez and Sanchez discussed an address "on Pinkham." Sanchez said he wanted the address so he "could have them wait … there, and know where to meet up …" and that they would "wait right there until they return and then we'll get our cut, and then everyone's gonna get their cut and then everyone's gonna take off." Around the same time, Emmanuel sent Sanchez a text asking what kind of shirts he wanted the "big guys to wear" or if a "uniform" would be provided. A later text said a uniform would be provided.

At 6:07 p.m., Benavidez sent Sanchez a text telling him to have "them" come to Pinkham Park and call when they get there, providing him with a phone number for "Jacob."

Ten minutes later, Sanchez sent Lopez a text with the phone number and said they would meet at "Jacob, the homies' pad," and Lopez replied that he would be there "at seven to meet the two

9

1  workers."

2  At 6:21 p.m., Sanchez called Emmanuel wanting to know if they
   were ready and if Cervando was with him, and to go to the location
3  "we were at earlier."

4  Sanchez also sent Benavidez a text asking for a police scanner and
   another text that said "everyone" would be there at 7:00 p.m.

5

6  At 6:30 p.m., four people got into the Nissan Altima parked at the
   house on Samoa Street and drove to Visalia. The Altima parked on
   Pinkham Street at 7:00 p.m. Benavidez drove up to his car and
7  spoke to the people in the Altima, and the Altima then followed
   Benavidez to his apartment on South Encina Street in Visalia.

8

9  Various messages were sent back and forth as to who was where.
   Eventually, at 7:18 p.m., Benavidez called Sanchez and said he had
   taken "[t]he homies" to his apartment because the "neighbors" at
10 "Jacob's pad" were "fishy." Lopez was informed and he arrived at
   Benavidez's apartment in a silver BMW.

11

12 At 7:35 p.m., Cervando called Sanchez, asking if they could use
   "the Nissan," as the "homies" could not "come through" with a car.

13 At 7:43 p.m., Hinojosa sent message to Emmanuel stating, "BS
   mission, Vato," but that "it's cool. We are still going to do it," and
14 "Vatos ain't even prepared at all."

15 At 7:47 p.m., Cervando called Emmanuel and told him the "fools"
   "didn't come prepared at all," they did not have a car so they would
16 have to take the Nissan and the guns they brought were without
   bullets. Emmanuel asked if he could tell Hinojosa and Corona to
17 "take control" and that he was depending on Corona to "make this
   shit happen."

18

19 Cervando then called Sanchez and said they needed another car and
   that he had told Emmanuel that "nothing was prepared." Sanchez
   told Cervando to tell Emmanuel that they would reconvene the
20 following evening at the same time and that they would get the
   vehicle and everything else in order.

21

22 At 8:11 p.m., Hinojosa sent a text to Emmanuel that "it looks kind
   of easy," but that there was "a cop who lives two houses down."
   Hinojosa assured Emmanuel that "we got this," and they would be
23 "properly prepared."

24 At 9:02 p.m., Sanchez sent Benavidez a text that said it looked "like
   we're going to have to do it ourselves," because "the homie on the
25 other end wasn't prepared like he mentioned." In another text,
   Sanchez said there was "no reason why we can't do it. I got the
26 layout. We can shoot them a cut for the heads-up. What you think?"
   Benavidez replied, "I think we can handle it. The little homie just
27 needs a few more heads." Sanchez replied that he had a "group"
   from Dinuba, and that it "[s]eems like it is worth the work. Good
28 Payoff. I'll holler tomorrow."

The following day, August 25, 2015, the messages resumed. At 10:15 a.m., Lopez sent Sanchez a text that everything was "on track," and they were in the area "doing a bit more homework on the two job sites." Sanchez agreed they would give it "another try tonight."

Beginning at noon, there were phone calls attempting to recruit Ricardo Reyes, who said he had a "squad already." Sanchez told him it was "two pads" that involved "[s]quare people" who had "safes and guns and gold. Just bring bangers [guns]." Sanchez said the homes were "neighbors" and told him how many people lived in the houses. Sanchez said there was a "safe spot, close by" to meet up. Hinojosa sent Emmanuel a text message that the job was still on.

At 5:49 p.m., Sanchez sent Benavidez a text message telling him everyone was going to meet at 7:00 p.m. and Benavidez said he would be there.

A little before 6:30 p.m., Corona sent text messages to Christian Arroguin and asked if he was available for a "mission." Corona then sent Cervando a text message that he "got someone." "Several" people took black jackets and other objects out of the trunk of Corona's Cadillac and went into the house on Samoa Street.

At 7:24 p.m., Lopez sent Sanchez a message that he was on his way and Sanchez sent Benavidez a message that "they in the area." Around the same time, the Altima and a black Mustang left Samoa Street and drove to Benavidez's apartment in Visalia.

At 7:45 p.m., Cervando told Emmanuel they were going to go to Benavidez's apartment and use the Altima and "go to the pad and do it." Cervando told Emmanuel they needed another car "to bring all the stuff back." Cervando told Emmanuel they had "Grinch on the team," and all they needed was a "safe car to get back."

At 7:49 p.m., Emmanuel called Sanchez and told him he was going to meet Cervando at Benavidez's place, and they would use his "whip to bring everything back." Lopez's silver BMW arrived at Benavidez's apartment.

A few minutes later Hinojosa confirmed that they had left Lindsay and were "all strapped [firearms] and everything." Emmanuel told Hinojosa that he was taking part in the job and was going to use his car, but that he did not want to go "strapless" if the occupants "come out or something." Hinojosa told him, "It's an old guy and an old lady."

At 7:53 p.m., Lopez sent a message to Sanchez that they were at Benavidez's. Sanchez replied they were "around the corner."

A little before 8:00 p.m., a person came out of the apartments and drove away in Lopez's BMW. A few minutes later, the Explorer,

Altima, and BMW arrived at the apartment. Emmanuel sent a text message to Sanchez saying, "[I]n motion. I'll update you soon."

At about the same time, the Altima and Explorer left the apartments, the Explorer behind the Altima, to prevent law enforcement from pulling the Altima. Officers in marked police cars attempted to stop the Altima at a red light, but the Altima sped away and led the officers on a high speed chase.

At 8:20 p.m., Emmanuel called Sanchez and Cervando called Benavidez to inform them that the Altima was leading the officers on a high speed chase and that "shots fired" had been announced on the police radio. Emmanuel told Sanchez this looked like a set up and asked who was in "that whip." Emmanuel said Saldana, Hinojosa, Corona and "two homies" from "their hood." Emmanuel said he was with Cervando and "three homies."

The Altima eventually crashed, and appellant, Hinojosa, Corona, and Sergio Hernandez ran from the car. All were apprehended and all were wearing black clothing. Inside the vehicle and surrounding area, officers found five loaded firearms, including an AR-style rifle, black latex gloves, and three ski masks.

Based on a hypothetical that tracked the information gathered through Operation Red Sol, Corporal Rose opined that the criminal activity was in association with, at the direction of, and for the benefit of a criminal street gang. Rose explained that the criminal activity involved gang members working together and benefited the gang as a means of generating revenue. The criminal activity also promoted the gang as the conduct was violent, thereby bolstering the reputation of the gang. According to Rose, the violent conduct causes victims and witnesses to be uncooperative and tells rival gangs that the gang is willing to do anything for their own personal gain.

### 2016 Attempted Murder of Christopher Martinez in Jail (Counts 2–4)

In July of 2016, Christopher Martinez was housed in a unit of the Bob Wiley Detention Facility where Hispanic Northern gang members are housed. According to Martinez, he beat up his cellmate, Christopher Gomez, which was a violation of gang rules. After the fight, Martinez turned in an "incident report" to inform the other gang members about what happened. In return, the gang disciplined him by watching him and keeping him "separate from the rest of [his] program."

Sometime later, Martinez was "broadsided" by "at least four people," including appellant and Gomez, as Martinez was coming out of the shower. He ended up on the ground, unable to protect himself, and was stabbed "a couple of times." At some point he lost consciousness. These facts were born out by a video of the attack which was shown to the jury. By the time correctional officer Russell Murphey arrived, Martinez was covered in blood, there was blood spatter on the wall, and a large pool of blood on the floor.

1

2     Martinez was in the hospital for at least a week and received
      stitches for cuts above both eyebrows, his forehead, and the back of
3     his head. He had a perforated lung and multiple stab wounds on the
      side of his arm and legs. One of his teeth was knocked out.
4     Martinez testified that he expected to receive some discipline for
      his fight with Gomez, but this was not "normal" discipline.

5     Correctional Officer Murphey testified that Northern gang members
      have rules dictating how they act, speak, and treat each other. The
6     officer explained that the "shot caller" would "typically" decide
      whether someone was to be disciplined and removed from the gang.
7     Disciplines can range from writing an essay to having longer and
      more difficult workouts. A removal involved several gang
8     members assaulting a person and can involve the use of weapons.

9     Correctional Officer Murphey opined that Martinez, appellant,
      Gomez, Ramos and Lopez were either active Northern or Norteño
10    gang members at the time of the attack. Based on a hypothetical
      that tracked the assault, the officer opined that the attack promoted
11    or benefited the gang because removing the individual would "show
      that his actions toward another active gang members would not be
12    tolerated." The attack also taught other gang members that there are
      rules Norteños must follow.

13

14    (Doc. 16-1 at 2079-89).

15    **IV.    ANALYSIS**

16        Respondent acknowledges that each of Petitioner's grounds were raised on direct appeal

17    to the Fifth Appellate District Court and denied on the merits, then subsequently raised and

18    summarily denied by the California Supreme Court.  Thus, each ground is exhausted, and the

19    Court looks through to the Fifth Appellate District's reasoned decision in evaluating each of

20    Petitioner's claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

21        **A.    Ground One-Consolidation**

22        In his first ground, Petitioner argues the trial court improperly consolidated his three

23    separate cases for trial.  (Doc. No. 9 at 5).

24            **1.  State Court Decision**

25        In denying Petitioner's claim, the Fifth Appellate District court found as follows:

26            **Consolidation of Charges**

27            As previously noted, appellant was charged in three separate cases
             that were consolidated for trial.  He now contends the trial court
28            abused its discretion by consolidating the cases because the crimes

13

were unrelated and there was very little cross-over evidence; there was a possibility that evidence of the separate incidents would have a spill-over effect and prejudice the jurors' ability to consider the charges separately; and that Judge Paden, who presided over the pretrial, was biased against him by prejudging the motion to consolidate and ignoring the possible resultant prejudice. He further contends that, even if the cases were properly consolidated, the judgment should be reversed because consolidating his cases resulted in "gross unfairness" that deprived him of his right to due process. We find no error and no denial of a fair trial.

*Background*

In May of 2016, appellant was charged with the July 2008 murder, with gang and firearm enhancements. In July of 2016, appellant and codefendant, Pedro Lopez, Jr., were charged with the August 2015 conspiracy to commit home invasion robbery, attempted home invasion robbery, possession of ammunition, and gang enhancements alleged. And in December of 2016, appellant and codefendants, Christopher Gomez and Jonathan Ramos, were charged in the July 2016 attempted murder, plus personal use of a deadly weapon, infliction of great bodily injury and gang enhancements. In each case, appellant was represented by different counsel.

On December 28, 2016, appellant appeared before Judge Gary L. Paden. Appellant's counsel, Michelle Wallis, informed the court that appellant had three cases, and she represented him only on the current case. Counsel informed the trial court that she was hoping for a "global offer, but that isn't happening." Judge Paden asked, "Why don't we try all three of his cases at the same time?" When told one of the cases involved a homicide that was committed in Porterville, Judge Paden told the parties to "bring it over here," and consolidate "all his murder cases." Counsel clarified that not all the cases were murder cases and one involved the "Red Sol" investigation. The prosecutor expressed favor in consolidating the cases and Judge Paden told the prosecutor to "[f]ile a motion. I'll consolidate them." When counsel argued that it was inappropriate to consolidate the crimes as they were "totally separate and unrelated," Judge Paden responded that the cases involved the "[s]ame class of crime. I'm not gonna give this guy three trials."

At the end of the hearing, Judge Paden told the prosecutor to "file a motion to consolidate." When counsel informed Judge Paden that there was "no time waiver on the homicide trial," Judge Paden responded that that case was not before him, and "[s]eems like a good way to circumvent the consolidation, though, is simply going to trial on the homicide in Porterville."

The prosecutor filed a motion January 10, 2017, to consolidate appellant's three cases on the grounds that the charged crimes were the same class of crimes and consolidation would promote judicial economy. The motion stated that the People intended to present evidence that the crimes were gang-related and evidence of appellant's involvement in the gang. The motion provided a brief

1    factual summary of the charged crimes.

2    Attorney Eric Hamilton, who represented appellant in the July 2008
     murder, filed an opposition to the motion to consolidate, arguing
3    there was no cross-admissible evidence, and that consolidating the
     cases would "inflame the jury" and prejudice appellant based on the
4    circumstances of the murder and his incarceration at the time of the
     jail attack.  Counsel also argued consolidation would create an
5    undue consumption of time and confuse the jurors.

6    Attorney Melissa Sahatjian, who represented appellant on the
     August 2015 conspiracy crimes, filed an opposition to
7    consolidation, arguing that consolidation would amount to "an
     incredible risk of prejudice" to appellant.  She also argued the cases
8    were not connected in their commission, involved different
     witnesses, and that conspiracy to commit robbery was not in the
9    same class of crimes as the other cases.  She also argued the
     cumulative effect would "inflame the jury" and prejudice appellant
10   based on a spill-over of evidence.

11   Attorney Wallis, who represented appellant in the July 2016
     attempted murder, filed a motion in opposition to consolidate,
12   arguing that joinder was "improper, highly prejudicial," "unfair,"
     and would interfere in the defenses presented in each case.
13

14   At the hearing held January 25, 2017, Judge Paden stated that he
     had read the motion to consolidate and the three motions in
15   opposition, and that his "tentative ruling" was to grant the motion to
     consolidate.  He explained that all three cases were gang- related,
16   much of the information would be admissible in all the cases, all the
     crimes were of the same class, and that he did not find, pursuant to
17   Evidence Code section 352, that doing so would be more
     prejudicial than probative.

18   Attorney Hamilton argued that judicial economy was not a valid
     reason to consolidate, estimating that the murder case would take
19   less than five days, the attempted jail murder a day or two, and the
     conspiracy case not more than a week.  He also argued keeping the
20   cases separate would place less of a burden on the jurors, the
     prejudice from the gang allegations was "substantial," and each
21   substantive crime involved different witnesses.  He acknowledged
     that the crimes were of the "same class," but that the cross-
22   admissibility of evidence related only to the "special allegations."

23   While Judge Paden stated that he would advise the selected jury to
     "judge each case on its own merits," Attorney Hamilton responded
24   that such admonishments are merely a suggestion and jurors are
     "gonna do whatever they want."
25

26   Attorney Wallis's primary argument was that consolidation would
     permit the prosecutor to "bootstrap these three cases together," and
     would hamper appellant's ability to put on a defense.
27

28   Attorney Sahatjian joined Attorneys Hamilton and Wallis's
     argument and also urged the trial court to consider the likelihood

that the charges would "inflame" the jury against appellant, noting the three crimes were "very serious events" that occurred over a span of eight years.

The prosecutor noted that appellant's attorneys did not appear to argue that the cases did not involve the same class of crimes. He also argued that the cross-admissibility of gang evidence in each case supported consolidation for judicial economy.

Following argument, Judge Paden granted the motion to consolidate.

### Asserted Judicial Bias

We first address appellant's claim that Judge Paden's remarks regarding consolidation revealed a prejudgment on the merits of the motion that was based, in part, on a prejudgment of appellant's guilt of the charges. Appellant never objected on this basis, or moved to disqualify Judge Paden for bias, at any time during the pretrial proceedings over which he presided. Accordingly, we agree with respondent that this claim is forfeited.

A defendant may not go to trial before a judge and gamble on a favorable result, and then assert for the first time on appeal that the judge was biased. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110; *People v. Chatman* (2006) 38 Cal.4th 344, 362–363; see *People v. Rogers* (1978) 21 Cal.3d 542, 548 ["The contrary rule would … 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal' "].) Moreover, as will be discussed below, the contention lacks merit, as we find no abuse of discretion in Judge Paden's ruling on the consolidation motion.

### Section 954

Section 954 discusses the consolidation of accusatory pleadings. It provides in relevant part:

> "An accusatory pleading may charge two or more different offenses connected together in their commission; or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated … provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."

" 'Offenses of the same class are offenses which possess common characteristics or attributes.' [Citations.]" (*People v. Landry* (2016)

2 Cal.5th 52, 76.)  All assaultive crimes against the person are considered to be of the same class.  (*People v. Walker* (1988) 47 Cal.3d 605, 622.)  Offenses are connected together in their commission when they share a common element of substantial importance, even though they do not relate to the same transaction and were committed at different times and places against different victims.  (*People v. Landry, supra,* 2 Cal.5th at p. 76; *People v. Leney* (1989) 213 Cal.App.3d 265, 269.)  "[T]he intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission.' [Citation.]"  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219.)

Joinder of the offenses with which appellant was charged in all three cases was statutorily permissible, because all were of the same class, connected together in their commission, or both.  (See *People v. Landry, supra,* 2 Cal.5th at pp. 76–77.)

Appellant does not appear to dispute murder, attempted murder, and home invasion robbery belong to the same class of crimes as they "share common characteristics as assaultive crimes against the person.  [Citations.]"  (*People v. Lucky* (1988) 45 Cal.3d 259, 276.)  Furthermore, all three crimes involved a " ' "common element of substantial importance" ' " in that all three were committed for the benefit of a criminal street gang.  (*Ibid.*)  In addition, the law favors the joinder of counts because it promotes efficiency.  (*People v. Merriman* (2014) 60 Cal.4th 1, 37.)

Even if consolidation of counts is authorized under section 954, courts still "must always examine consolidation motions for their potentially prejudicial effect …." (*People v. Lucky, supra,* 45 Cal.3d at p. 277.)  "Prejudice may arise from consolidation where it allows the jury to hear inflammatory evidence of unrelated offenses which would not have been cross-admissible in separate trials." (*Ibid.*)  Where the statutory requirements for joinder are met, a defendant must make a " 'clear showing of prejudice' " to establish that the trial court abused its discretion.  (*People v. Simon* (2016) 1 Cal.5th 98, 122–123; see *People v. Merriman, supra,* 60 Cal.4th at p. 37.)

In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling.  (*People v. Price* (1991) 1 Cal.4th 324, 388.) In evaluating whether the trial court abused its discretion, we consider:  "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case.  [Citation.]" (*People v. Simon, supra,* 1 Cal.5th at p. 123.)  "A court abuses its discretion when its ruling 'falls outside the bounds of reason.' [Citation.]"  (*People v. Osband*  (1996) 13 Cal.4th 622, 666; accord *People v. Soper* (2009) 45 Cal.4th 759, 774.)

17

*Cross-Admissibility of Evidence*

We first consider the issue of cross-admissibility.  Appellant argues there was no showing at the time Judge Paden made his ruling that the evidence in the three cases would have been cross-admissible because "[t]he prosecutor offered no analysis whatsoever to assert cross-admissibility under [Evidence Code] section 1101, subdivision (b)."

"If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.  [Citation.]"  (*People v. Soper, supra,* 45 Cal.4th at pp. 774–775; accord *Alcala v. Superior Court, supra,* 43 Cal.4th at p. 1221; *People v. Jenkins* (2000) 22 Cal.4th 900, 948.)  " '[T]he issue of cross- admissibility "is not cross-admissibility of the charged offenses but rather the admissibility of relevant evidence" that tends to prove a disputed fact. [Citations.]' [Citation.]  Thus, … ' "complete (or so-called two-way) cross-admissibility is not required.  In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A' – even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " ' [Citation.]"  (*People v. Capistrano* (2014) 59 Cal.4th 830, 849, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

"Whether the evidence of other crimes would have been admissible in separate trials on the others is governed by Evidence Code section 1101, subdivision (b), which permits admission of other uncharged acts when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes."  (*People v. Lucas* (2014) 60 Cal.4th 153, 214–215, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.)  "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' [Citations.]'  [Citation.]"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)  "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual."  (*Id.* at p. 403.)  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.  For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.]  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'  [Citation.]"  (*Ibid.*)  Similarity of offenses is not required to establish the motive theory of relevance.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1115.)

The gang evidence – both in general and as it specifically related to

each case – would have been cross-admissible in all three cases to show motive, intent, and knowledge, and, as between the murder and attempted murder cases, common scheme or plan. (*People v. Valdez* (2012) 55 Cal.4th 82, 130–131; and see *People v. McKinnon* (2011) 52 Cal.4th 610, 655–656 [gang evidence properly admitted to show motive; although, even where relevant, gang evidence may have highly inflammatory impact on jury, probative value of motive generally exceeds prejudicial effect].)

However, "[w]hile the presence of [cross-admissible] evidence ' "is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges" ' [citation], the absence of cross-admissible evidence does not bar joinder." (*People v. O'Malley* (2016) 62 Cal.4th 944, 968.)

### Potential Prejudice from Joinder

Assuming arguendo that the evidence underlying the joined charges would *not* be cross-admissible, we proceed to consider " 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the 'other-crime''' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]" (*People v. Soper, supra,* 45 Cal.4th at p. 775.) In making that assessment, we consider three additional factors, any of which – combined with our earlier determination of absence of cross-admissibility – might establish an abuse of the trial court's discretion:  (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.  (*Ibid.*)

Here, appellant argues the charges together are particularly likely to inflame and prejudice the jury against him and the jury would fail to consider the evidence of each of his crimes separately.  But to do so, appellant must show "an 'extreme disparity' in the strength or inflammatory character of the evidence.  [Citation.]" (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1436.)  The information Judge Paden had at the time of the ruling – from the prosecutor's motion to consolidate and appellant's oppositions – shows no such disparity.

In the case of the July 2008 murder, it was alleged that appellant called the victim a "Scrap," a derogatory term for the rival gang of the Norteños, and eyewitnesses saw appellant strangle and stab the victim.  In the August 2015 conspiracy to commit home invasion robbery, appellant was referred to in intercepted telephone calls and text messages as someone who wanted to participate in the home invasion robbery.  Appellant was subsequently in the car officers attempted to stop as it was driving towards the neighborhood where the robbery was to take place.  Following a car chase, appellant was one of the occupants of the vehicle apprehended, along with guns, ammunition, gloves and ski masks.  And in the July 2016 attempted

murder in jail, appellant was one of four inmates in a unit designated for Norteño gang members who participated in a coordinated attack on the victim.

There was sufficient information before Judge Paden to show equal strength of evidence against appellant in all three cases, and it cannot be said that one act was more or less inflammatory than the other.  As the California Supreme Court has stated: "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other.  A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges. [Citation.] Furthermore, the benefits of joinder are not outweighed – and severance is not required – merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.  [Citations.]" (*People v. Soper, supra,* 45 Cal.4th at p. 781.)

Appellant has failed to show that Judge Paden abused his discretion in consolidating the three cases.  (*People v. Soper, supra,* 45 Cal.4th at p. 783.)  Nor has appellant shown that the consolidation resulted in a trial that violated his right to due process, as we discuss next.

### Due Process

Even if a trial court's ruling was proper at the time it was made, the reviewing court "must still determine whether the joinder of charges resulted in ' " gross unfairness depriving the defendant of due process of law." ' [Citation.]" (*People v. Trujeque* (2015) 61 Cal.4th 227, 259.)  To establish gross unfairness amounting to a due process violation, a defendant must show there was a " 'reasonable probability' that the joinder affected the jury's verdicts. [Citations.]" (*People v. Ybarra, supra,* 245 Cal.App.4th at p. 1438.)

The evidence which related to each case, as detailed earlier, was distinct and independently strong to support appellant's convictions, and appellant does not challenge the sufficiency of the evidence.  Appellant points to two examples in the prosecutor's closing remarks that he contends shows the prosecutor sought guilty verdicts by "drawing comparisons with the other criminal episodes."  However, it is reasonable to assume that the jurors understood the prosecutor's closing remarks as attempting to persuade the jury to find appellant guilty of all charges, not guilty based merely on the strength of evidence in some but not other charges.  In fact, the prosecutor, in closing, specifically stated that there were "three different incidents that happened, the murder, the attempted murder, in jail, and we have the wiretap stuff.  And all three of those are separate incidents."

The trial court also instructed the jury, pursuant to CALCRIM No. 3515, that it must "consider each count separately and return a

1
2
3
4
5

> separate verdict for each one." We note the jury found appellant guilty of the lesser offense in count 1 of second degree murder, as opposed to the allegation that he committed first degree murder. This demonstrates jurors were capable of, and did, differentiate among the various charges, allegations, and evidence. (See *People v. Jones* (2013) 57 Cal.4th 899, 927.) It further demonstrates jurors did not impermissibly cumulate evidence or assume that, because of the evidence on certain charges, appellant was guilty of all charges.

6
7
8

> We find no abuse of discretion on the part of the trial court in consolidating the three cases and appellant has not satisfied his burden of showing that consolidating the three cases resulted in gross unfairness that deprived him of his right to due process of law.

9       (Doc. No. 16-1 at 2089-2100 (footnote omitted)).

10                      **2.   Analysis**

11      Petitioner asserts the state court's decision was contrary to clearly established federal law

12   because the court "rejected [his] contention of error without addressing the abuse of discretion

13   arising from judicial bias" and lack of cross-admissible evidence "based solely upon concluding

14   there was no potential for undue prejudice from joining trial on three separate matters in the same

15   class of crime." (Doc. No. 9 at 5). However, Petitioner does not provide any further explanation

16   or citation as to how the state court's decision was contrary to federal law. (*See id.*).

17      Respondent argues "Petitioner makes little effort to address the reasonableness of the state

18   court rejection" and fails to "cite a Supreme Court case which clearly sets forth just when and

19   how, as a constitutional matter, a state trial court must sever charges." (Doc. No. 19 at 21-22).

20   Further, Respondent asserts "there is no clearly established Supreme Court precedent addressing

21   the issue of severance." (*Id.* at 22 (citing *Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir.

22   2010))). To the extent Petitioner is challenging the state court's holding that evidence was cross

23   admissible under state law, Respondent asserts such is not a proper ground for habeas relief and

24   Petitioner has not cited a case to the contrary. (*Id.*). Finally, Respondent argues Petitioner cannot

25   show consolidation of the charges had a "substantial and injurious effect or influence in

26   determining the jury's verdict" because the state court reasonably determined that joinder did not

27   prejudice Petitioner. (*Id.* at 23).

28      In response, Petitioner argues he should be given relief from prejudicial joinder under

                                           21

1  Rule 14 of the Federal Rules of Criminal Procedure.  (Doc. No. 28 at 8).  Based on Respondent's

2  argument that Petitioner must cite case law establishing when and how a trial court must sever

3  charges, Petitioner asserts "it is reasonable to believe that Respondent agrees with Petitioner's

4  request for relief under Rule 14 however lacked the guidance."  (*Id.* at 9).  Petitioner then cites

5  *United States v. Deleon*, Nos. CR 15-4268 JD, CR 19-3725 JB, CR 20-1629 JB2021, U.S. Dist.

6  LEXIS 247252 (D.N.M. Dec. 29, 2021), as supporting his argument.  (*Id.*).

7    Petitioner misunderstands Respondent's argument.  Respondent highlighted Petitioner's

8  failure to cite Supreme Court precedent addressing when severance is required *not* as an

9  indication that Respondent agreed with Petitioner but rather to highlight that Petitioner has not

10  satisfied his burden to show he is entitled to federal habeas relief.  Petitioner's citation to *Deleon*,

11  a district court case addressing whether consolidation was proper under the Federal Rules of

12  Criminal Procedure, does nothing to correct this failure.  Overall, despite asserting the state

13  court's decision was contrary to clearly established federal law, Petitioner fails to cite *any*

14  Supreme Court precedent setting forth the governing law regarding severance and establishing he

15  is entitled to habeas relief.

16    While this failure alone is sufficient to deny Petitioner relief on this claim, Petitioner is

17  also not entitled to relief under the standards set forth by the Ninth Circuit.  Federal courts "may

18  grant habeas relief on a joinder challenge only if the joinder resulted in an unfair trial."  *Walden v.*

19  *Shinn*, 990 F.3d 1183, 1197 (9th Cir. 2021).  Similarly, a claim of judicial misconduct by a state

20  judge in the context of federal habeas review will warrant habeas relief only where the judge's

21  behavior "rendered the trial so fundamentally unfair as to violate federal due process under the

22  United States Constitution."  *Brown v. Madden*, 858 F. App'x 242, 243 (9th Cir. 2021) (quoting

23  *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995)).  Thus, regardless of whether Petitioner's

24  first ground is framed as a challenge strictly to the consolidation or as a claim of judicial bias

25  based on the consolidation, he must show that consolidation rendered his trial fundamentally

26  unfair.

27    The state appellate court reasonably determined the trial court did not abuse its discretion

28  in consolidating the charges because the "gang evidence – both in general and as it specifically

related to each case – would have been cross-admissible in all three cases to show motive, intent, and knowledge;" there was sufficient information before the trial court "to show equal strength of evidence against [Petitioner] in all three cases, and it [could not] be said that one act was more or less inflammatory than the other;" and the trial court instructed the jury to consider each count separately in rendering a verdict.  (Doc. No. 16-1 at 2097-99).  As the state appellate court observed, the jury's rejection of the first degree murder charge in favor of conviction of the lesser included offense of second degree murder "demonstrates jurors were capable of, and did, differentiate among the various charges, allegations, and evidence."  (*Id.* at 2099).  In light of the evidence presented in relation to each separate charge and the jury's clear understanding that they were required to consider each charge separately as instructed, Petitioner has not shown that consolidation rendered his trial so fundamentally unfair as to violate his right to due process.  *See Honeycutt v. Donat*, 535 F. App'x 624, 628 (9th Cir. 2013) (finding joinder of charges did not violate petitioner's due process rights because evidence was cross-admissible and evidence "on both sets of charges was strong, foreclosing any argument that evidence of the stronger charge would taint the jury's view of the weaker").

The state appellate court's rejection of Petitioner's consolidation claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts.  The undersigned recommends that ground one be denied.

**B.    Ground Two-Ineffective Assistance of Counsel**

In his second ground, Petitioner argues his trial counsel was ineffective based on counsel's failure to (1) move to strike coconspirator hearsay statements; (2) request modification of a jury instruction regarding coconspirator hearsay; and (3) use closing argument to urge the jury to reject the coconspirator hearsay statements.  (Doc. No. 9 at 7).

**1.  State Court Decision**

In rejecting Petitioner's ineffective assistance claim, the Fifth Appellate District court found as follows:

**Ineffective Assistance of Counsel**

Appellant was charged in counts 5 through 10 with events that occurred on August 24 and 25, 2015, conspiracy to commit home invasion robbery, attempted robbery, as well as possession of a firearm and ammunition. While appellant acknowledges there is solid supported evidence of his possession of a firearm and ammunition when he was arrested, coupled with proof of his prior felony conviction for firearm offenses (counts 9 and 10), he argues the prosecutor relied extensively on evidence of hearsay text messages and intercepted telephone conversations between alleged coconspirators to prove appellant's guilt on the alleged conspiracy and attempted robbery offenses, and trial counsel was prejudicially ineffective for failing to move to strike the improperly admitted coconspirator hearsay evidence. He also alleged trial counsel was ineffective for failing to request amplification on a corresponding jury instruction and in closing argument when addressing the home invasions charges, and that the convictions in counts 5, 6, and 8 must be reversed. We find no ineffective assistance of counsel.

*Background*

In its trial brief with motions in limine, the prosecution sought the trial court's ruling allowing admission of hearsay under the coconspirator exception, Evidence Code section 1223, to be introduced prior to establishing the existence of a conspiracy. The defense filed motions in limine urging the trial court to exclude coconspirator statements on grounds that there was no evidence independent of the hearsay statements to sustain a prima facie demonstration of a conspiracy to commit home invasion robberies. Acknowledging the discretion of the trial court to alter the order of proof, trial counsel objected to the introduction of hearsay statements of alleged coconspirators prior to proof establishing the existence of the alleged conspiracy and appellant's participation therein.

When the trial court asked trial counsel if there were "any statements" he was aware of that he would be objecting to, counsel stated it was "hard to say until [he] hear[d] specifically which ones." Counsel said he could go through the grand jury indictment, but that there were a lot of "things" that were not "really relevant to anything except getting along, getting haircuts or something." The trial court asked counsel if there was some way to "pinpoint and identify certain statements," but counsel did not identify any.

The trial court, wishing to avoid a lengthy section 402 hearing and in the interests of judicial economy, granted the People's motion, subject to a motion to strike should the foundation not be laid.

At the close of the case in chief, trial counsel did not move to strike the conspirator hearsay evidence, but instead asked the trial court to set aside the charges in, as applicable here, counts 5 and 7. The trial court granted the motion to set aside count 7.

The trial court instructed the jury, without objection, with

1    CALCRIM No. 418, as required on the use of a coconspirator's statement to incriminate a defendant if the statement has been
2    admitted under Evidence Code section 1223.

3    ***Ineffective Assistance of Counsel***

4    **Hearsay Statements**

5    " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing that is offered to
6    prove the truth of the matter stated." (Evid. Code, § 1200.) Hearsay is generally inadmissible unless it falls under an exception (Evid.
7    Code, § 1200, subd. (b)), such as the coconspirator hearsay exception, Evidence Code section 1223. That exception states,
8    "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: (a) The statement was made by
9    the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that
10   conspiracy; (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and (c) The
11   evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or,
12   in the court's discretion as to the order of proof, subject to the admission of such evidence."
13
14   "A conspiracy is an agreement between two or more persons, with specific intent, to achieve an unlawful objective, coupled with an
      overt act by one of the conspirators to further the conspiracy.
15   [Citation.]" (*People v Gann* (2011) 193 Cal.App.4th 994, 1005.) The existence of a conspiracy must be established independently of
16   the statement of the coconspirator. (*People v. Leach* (1975) 15 Cal.3d 419, 423–424; *People v. Jeffrey* (1995) 37 Cal.App.4th 209,
17   215.) "This fact need not be established beyond a reasonable doubt, or even by a preponderance of the evidence. [Citation.] The
18   conspiracy may be shown by circumstantial evidence and 'the agreement may be inferred from the conduct of the defendants
19   mutually carrying out a common purpose in violation of a penal statute.' [Citations.]" (*People v. Olivencia* (1988) 204 Cal.App.3d
20   1391, 1402–1403.) The court's discretion as to the order of proof, as enunciated in section 1223, subdivision (c), makes the putative
21   requirement of an advance showing of the preliminary facts in effect a requirement of an independent showing, since the change in
22   the order of proof is more generally the rule than the exception. (*People v. Leach, supra,* 15 Cal.3d at p. 432, fn. 10.)
23
24   At trial, the prosecution presented evidence of telephone calls and text messages between Norteño gang members that occurred over
25   two days to prove the existence of a conspiracy to commit home invasion robberies. On appeal, appellant argues that trial counsel
26   was ineffective for failing to strike the recorded statements as inadmissible coconspirator hearsay evidence
      .
27   As noted above, Evidence Code section 1223 permits evidence of a statement made while participating in a conspiracy, in furtherance
28   of the conspiracy's objective, so long as the statement was made

1    before or during the conspiracy and a proper foundation of the
     underlying conspiracy is made. On appeal, appellant does not
2    specify which statements he is referring to when challenging trial
     counsel's decision not to object to such statements. An appellate
3    court is "not required to search the record to ascertain whether it
     contains support [for the appellant's] contentions. [Citations.]"
4    (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539,
     545.) In any event, we find no merit to appellant's claim of
5    ineffective assistance of counsel

6    "[T]o establish a claim of ineffective assistance of counsel,
     defendant bears the burden of demonstrating, first, that counsel's
7    performance was deficient because it 'fell below an objective
     standard of reasonableness … under prevailing professional norms.'
8    [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.)

9    Here, trial counsel was not ineffective for failing to make a motion
     to strike the coconspirators' hearsay statements because the
10   prosecution presented the following evidence to establish prima
     facie existence of a conspiracy to commit home invasion robbery
11   from the surveillance observations and events surrounding
     appellant's arrest, independent of any alleged hearsay statements by
12   appellant's coconspirators.

13   On the afternoon of August 24, 2015, Sanchez, the regiment
     commander for the Tulare County Norteños, arrived at the Samoa
14   Street house where Emmanuel, Cervando, and Corona lived.
     Emmanuel was the southern district leader; Cervando later took
15   over as the southern district leader; and Corona was a squad leader.
     Immediately after Sanchez arrived, another car arrived at the house
16   occupied by four people, who got out of the car, spoke to Sanchez
     and then Sanchez left.

17
     Less than an hour later, four people got into a Nissan Altima parked
18   at the Samoa Street house and drove to a barber shop in Lindsay,
     which was closed. The Altima then made a few more stops before
19   driving back to Samoa Street house. At 6:30 p.m., four people got
     into the Altima and drove to Visalia, where they met Benavidez on
20   Pinkham Street. Benavidez was an "influential" Norteño gang
     member being groomed for a regiment commander position. The
21   two cars then drove to Benavidez's apartment in Visalia.

22   Around 7:50 p.m., a silver BMW associated with Lopez, the
     regiment commander for the Fresno County Norteños, left
23   Benavidez's apartment and returned 10 minutes later. About 20
     minutes later, several people got into the BMW and drove to
24   Pinkham Street. The car drove slowly through the neighborhood
     and then back to Benavidez's apartment.
25
     The following day, August 25, 2016, at 5:46 p.m., Corona and
26   another individual drove away in his Cadillac. When Corona
     returned to the house, several people came outside and took black
27   jackets and other objects inside.

28   Around 7:20 p.m., four people got into the Altima and drove to

1    Benavidez's apartment in Visalia. Less than an hour later,
      Emmanuel's Explorer, the Altima, and BMW arrived at
2    Benavidez's apartment within minutes of each other.

3    Close to 8:30 p.m., the Altima and Explorer left the apartment
      complex, the Explorer driving directly behind the Altima as a
4    "blocking vehicle" to prevent law enforcement from pulling over
      the Altima. When officers attempted a traffic stop on the Altima,
5    the vehicle sped away and led the officers on a high speed chase.

6    The Altima eventually crashed and five people, all wearing dark
      clothing, ran from the vehicle, including appellant, Lopez,
7    Hinojosa, and Corona. Officers searched the Altima and
      surrounding area and found five loaded guns, including an AR-style
8    assault rifle, three ski masks, and latex gloves.

9    Emmanuel and Cervando were standing by the Explorer not far
      from where the pursuit ended. They got back into the Explorer and
10   drove to Benavidez's apartment.

11   Officer Szatmari testified that it was believed, based on the
      intercepted communications and surveillance, that the homes
12   targeted for the robberies were on Pinkham Street.

13   There was sufficient independent evidence from which a reasonable
      trier of fact could find it more likely than not that a conspiracy to
14   commit home invasion robbery existed when the coconspirators'
      made any hearsay statements. (See *People v. Herrera* (2000) 83
15   Cal.App.4th 46, 63.) Failing to object did not fall below an
      objective standard of reasonableness as trial counsel has no duty to
16   argue a meritless claim. Appellant has not shown he received
      ineffective assistance of counsel. (*People v. Reynolds* (2010) 181
17   Cal.App.4th 1402, 1409.)

18   ***Jury Instruction***

19   When a coconspirator's statement that would otherwise be hearsay
      is admitted into evidence pursuant to the exception set forth in
20   Evidence Code section 1223, the trial court has a sua sponte duty to
      instruct the jury pursuant to CALCRIM No. 418. (Bench Notes to
21   CALCRIM No. 418 [reciting that the instructional duty is sua
      sponte]; see also *People v. Jeffery, supra*, 37 Cal.App.4th at p. 215.)
22   CALCRIM No. 418, as given here without objection, provided, in
      relevant part:
23
24        "In deciding whether the People have proved that the
           defendant committed the crime charged, you may not
25        consider any statement made out of court by Pedro Sanchez,
           Pedro Lopez, Valentine Ornelas, Rigoberto Benavides,
           Emanuel Avalos, Cervando Avalos, Luis Corona, Juan
26        Hinojosa, or Ricard Reyes unless the People have proved by
           a preponderance of the evidence that:
27
           "Number one, some evidence other than the statement itself
28        establishes that a conspiracy to commit a crime existed

27

1    when the statement was made.

2    "Those conspirators who I mentioned, were members of and
participating in the conspiracy when they made the
3    statement;

4    "Those individuals made the statement in order to further
the goal of the conspiracy;

5
"And four, the statement was made before or during the
6    time that the defendant was participating in the conspiracy."

7    Appellant argues trial counsel was ineffective for failing to ask the
trial court to amplify CALCRIM No. 418 because the instruction
8    "required only [that] the jury find proof of the existence of a
'conspiracy to commit *a crime*' independent of the statements in
9    order to consider the statements as proof 'the defendants committed
*the crime charged*,' i.e., conspiracy to commit home invasion
10    robbery." As argued by appellant, the pattern instruction "would be
better formed and serve the ends of justice with the
11    addition of a 'fill in the blank' to insert the object of the criminal
conspiracy."
12
The record does not reveal why trial counsel did not ask for an
13    amplification of the instruction, but the instruction as written is a
correct statement of the law and trial counsel could have reasonably
14    concluded that the standard instruction was adequate.

15    Furthermore, CALCRIM No. 415, which was given immediately
prior to CALCRIM No. 418, expressly stated that appellant was
16    charged with "conspiracy to commit home invasion robbery at
Locations 1 and 2", a phrase that repeated numerous times during
17    the instruction. The instruction further told jurors that, to find
appellant guilty of conspiracy to commit home invasion robbery,
18    the prosecution must prove that appellant, or "Pedro Sanchez, Pedro
Lopez, Valentine Ornelas, Emmanuel Avalos, Cervando Avalos,
19    Rigoberto Benavides, Luis Corona, Juan Hinojosa, or Ricardo
Reyes" "or all of them" committed at least one of the specified
20    overt acts to accomplish the home invasion robbery.

21    And immediately following CALCRIM No. 418, the jury was
instructed, pursuant to CALCRIM No. 419, that appellant "is not
22    responsible for any acts that were done before he joined the
conspiracy," that evidence of acts or statements made before
23    appellant joined the conspiracy could only be considered "to show
the nature and goals of the conspiracy," and that the jury was not to
24    consider any such evidence to prove appellant was "guilty of any
crimes committed before he joined the conspiracy."
25
Jurors are presumed to be intelligent and capable of understanding
26    and correlating all jury instructions given. (*People v. O'Malley,
supra,* 62 Cal.4th at p. 991.) Read together, these instructions made
27    clear that the object of the conspiracy was home invasion robbery,
and that "conspiracy to commit a crime" in CALCRIM No. 418
28    referred to home invasion robbery. " ' "Instructions should be

28

interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation" [Citation.]' [Citation.]" (*People v. Spaccia* (2017) 12 Cal.App.5th 1278, 1287.)

Given the state of the evidence and the instructions given, there is no reasonable probability appellant would have received a more favorable verdict on counts 5, 6, and 8 if CALCRIM No. 418 had been amplified as appellant suggests. Appellant has not shown trial counsel was ineffective for failing to make this request.

### *Closing Argument*

In addressing the conspiracy charges in closing, trial counsel urged the jury to find reasonable doubt based on a lack of evidence of when appellant joined the crew in the car, lack of proof of when and how he might have been recruited, lack of any of his statements in the intercepted communications, and urged the jurors to scrutinize whether appellant had any knowledge of the home invasion robbery operation.

Appellant contends trial counsel was ineffective because his argument was defective as it "necessarily endorsed" the notion that the coconspirators statements should be considered and trial counsel failed to enlighten the jury on the requirement of independent evidence to establish a conspiracy to commit home invasion robbery, withdrawing a potentially meritorious defense.

"The right to effective assistance of counsel extends to closing arguments. [Citations.] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing argument should 'sharpen and clarify the issues for resolution by the trier of fact' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5–6.) The decision of how to argue to the jury after the presentation of evidence is inherently tactical and "rarely demonstrates incompetence" (*People v. Freeman* (1994) 8 Cal.4th 450, 498), and our judicial review of a defense attorney's summation is "highly deferential" (*Yarborough v. Gentry, supra,* at p. 6.)

Trial counsel's decision here to try and create reasonable doubt by highlighting certain aspects of the prosecution's case, and not to focus on the coconspirators' statements was a matter of trial tactics and strategy that we do not " 'second-guess.' " (*People v. Williams* (1997) 16 Cal.4th 153, 219.) Furthermore, because there was evidence, independent of the coconspirators' hearsay statements, to establish a prima facie existence of a conspiracy to commit home invasion robbery, appellant has not shown there is a reasonable probability he would have obtained a more favorable verdict had trial counsel made the argument he now urges.

(Doc. 16-1 at 2100-08 (footnote omitted)).

29

1          **2.  Analysis**

2          Here, while Petitioner asserts the state court's rejection of his ineffective assistance

3   claim was contrary to clearly established federal law, he fails to provide any substantive

4   argument engaging with the state court's analysis.  (*See* Doc. No. 9 at 7).

5          Respondent argues Petitioner is not entitled to relief on any of his subclaims of

6   ineffective assistance.  First, Respondent argues Petitioner cannot show that an objection to

7   the coconspirator statements would have merit because "[s]uch a showing would necessarily

8   require this Court to disagree with the California Court of Appeal that, as a matter of state

9   law, the co-conspirator statements were admissible" and this Court cannot do so on federal

10  habeas review.  (Doc. No. 19 at 29-30).  Next, Respondent argues "counsel had no duty to

11  seek a more beneficial format [to the jury instruction] just because Petition thinks it would be

12  more palatable to a jury" and "a fairminded jurist could conclude, as did the California Court

13  of Appeal, that Petitioner's proposed change in formatting would not have affected the

14  outcome on the conspiracy counts."  (*Id.* at 30).  Finally, Respondent argues Petitioner's

15  challenge to counsel's closing argument is meritless because "reasonable counsel could

16  conclude the statements were corroborated" such that counsel's decision to refrain from

17  arguing the jury should ignore the coconspirator statements was at least strategic.  (*Id.* at 31).

18         Petitioner responds that the objective of the alleged conspiracy "was not established

19  by any evidence independent of the hearsay statements" such that counsel was ineffective

20  when he failed to move to strike the statements.  (Doc. No. 28 at 12).  Petitioner argues

21  counsel was ineffective for failing to request amplification to ensure the jury was adequately

22  instructed regarding the statements because the trial court's "generic instruction, requiring

23  only independent proof of conspiracy to commit 'a crime,' misled the jury without

24  amplification."  (*Id.* at 12-13).

25         Criminal defendants have a right to counsel at trial and on direct appeal.  U.S. Const.

26  Amend VI.  Claims alleging that trial or appellate counsel were constitutionally ineffective

27  require the Court to engage in the two-step analysis set forth in *Strickland v. Washington*,

28  466 U.S. 668 (1984).  Under the first prong of that test, the petitioner must prove that his

attorney's representation fell below an objective standard of reasonableness. *Id*. at 687-88. To demonstrate deficient performance, the petitioner must show his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000). In reviewing trial counsel's performance, however, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Only if counsel's acts and omissions, examined within the context of all the circumstances, were outside the "wide range" of professionally competent assistance, will petitioner meet this initial burden. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986); *Strickland*, 466 U.S. at 689-90.

Under the second part of *Strickland's* two-prong test, the petitioner must show that he was prejudiced by counsel's conduct. 466 U.S. at 694. Prejudice is found where there is a reasonable probability that, but for his counsel's errors, the result would have been different. *Id*. The errors must not merely undermine confidence in the outcome of the trial but must result in a proceeding that was fundamentally unfair. *Williams*, 529 U.S. at 393 n.17; *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The petitioner must prove both prongs: deficient performance and prejudice. A court need not, however, determine whether counsel's performance was deficient before determining whether the petitioner suffered prejudice as the result of the alleged deficiencies. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Here, the state appellate court, although not citing directly to *Strickland*, applied the same standard and determined each of Petitioner's ineffective assistance claims were without merit. (Doc. 16-1 at 2103-08). As to Petitioner's first claim, the appellate court found counsel did not perform deficiently in failing to move to strike the statements because "[t]here was sufficient independent evidence from which a reasonable trier of fact could find it more likely than not that a conspiracy to commit home invasion robbery existed when the coconspirators' made any

1    hearsay statements" such that a motion to strike would have been meritless.  (*Id.* at 2103-05).  A

2    review of the trial transcripts reveals that multiple officers testified about their observations

3    during the surveillance operation, including seeing the coconspirators coming and going from a

4    residence where they were meeting; carrying black jackets into the residence; driving slowly

5    down the street where the robbery was to occur; leaving in a white Nissan, which ultimately

6    crashed following a police chase; and fleeing from the vehicle, which contained guns, gloves, and

7    masks.  (*See, e.g.*, Doc. 16-1 at 1281-83, 1286-87, 1290, 1298-99, 1313, 1322-26, 1334-39, 1364-

8    86, 1405-37, 1441-52, 1455-83).  Because, as the state court concluded, this independent

9    evidence was sufficient to allow consideration of the hearsay statements, counsel was not

10   ineffective for failing to bring a motion to strike.  *See Polk Cnty. v. Dodson*, 454 U.S. 312, 324

11   (1981) ("It is the obligation of any lawyer—whether privately retained or publicly appointed—

12   not to clog the courts with frivolous motions or appeals."); *Wooten v. Montgomery*, 815 F. App'x

13   124, 126 (9th Cir. 2020) (failure to file meritless motion to suppress was not deficient

14   performance to support ineffective assistance habeas claim); *Juan H. v. Allen*, 408 F.3d 1262,

15   1273-74 (9th Cir. 2005) (habeas relief not warranted on ineffective assistance claim based on

16   failure to bring meritless objection to evidence).

17        Turning to the second claim, the state court concluded Petitioner was not prejudiced

18   by counsel's failure to request the trial court amplify the jury instruction concerning

19   consideration of the hearsay statements because the jury instructions, "[r]ead together …

20   made clear that the object of the conspiracy was home invasion robbery, and that 'conspiracy

21   to commit a crime' in CALCRIM No. 418 referred to home invasion robbery."  (Doc. 16-1 at

22   2107).  Specifically, the trial court instructed that to find Petitioner guilty of conspiracy to

23   commit a home invasion robbery, the state was required to prove that Petitioner and his

24   coconspirators agreed "to commit home invasion at Locations 1 and 2," intended to commit

25   home invasion robbery, and took overt acts to accomplish the home invasion robbery.  (*Id.* at

26   1663).  The court then instructed the jury that before considering the coconspirators'

27   statements, it must find that there was evidence "that a conspiracy to commit the crime

28   existed when the statement was made."  (*Id.* at 1666).  Thus, as the state appellate court

1   explained, the instructions together made clear that the object of the conspiracy was home

2   invasion robbery such that Petitioner was not prejudiced by counsel's failure to request

3   amplification. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (jury instructions must be

4   evaluated in the light of the instructions as a whole and the entire trial record).

5        As to the final claim of ineffective assistance based on counsel's failure to use closing

6   arguments to urge the jury to reject the coconspirators' statements, the appellate court

7   concluded counsel did not perform deficiently because the decision to "try and create

8   reasonable doubt by highlighting certain aspects of the prosecution's case … was a matter of

9   trial tactics and strategy that [reviewing courts] do not 'second-guess'" and Petitioner was

10  not prejudiced because "there was evidence, independent of the coconspirators' hearsay

11  statements, to establish a prima facie existence of a conspiracy to commit home invasion

12  robbery." (Doc. 16-1 at 33). In closing arguments, trial counsel highlighted that in "all of

13  the wire taps, text messages, surveillance," Petitioner was not mentioned and there was only

14  mention of "getting Grinch involved" without evidence or surveillance to establish when he

15  arrived or became involved. (*Id.* at 1758-60). Thus, instead of urging the jury to reject the

16  statements, trial counsel made a tactical decision to argue that even if the statements were

17  considered, they did not support a guilty verdict. This tactical decision does not amount to

18  deficient performance. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has

19  wide latitude in deciding how best to represent a client, and deference to counsel's tactical

20  decisions in his closing presentation is particularly important because of the broad range of

21  legitimate defense strategy at that stage."). Further, in light of the additional, independent

22  evidence discussed above to support the conspiracy conviction, Petitioner cannot show he

23  was prejudiced by counsel's failure to urge the jury to reject the statements.

24       Based on the foregoing, Petitioner cannot show that the state court's rejection of his

25  ineffective assistance claims was contrary to, or an unreasonable application of, clearly

26  established Supreme Court precedent, nor that it was based on an unreasonable determination

27  of the facts. The undersigned recommends that ground two be denied.

28

1

**C.     Ground Three-Sufficiency of the Evidence**

2

In his third ground, Petitioner argues there was insufficient evidence to support that

3

members of his gang engaged in a pattern of criminal activity prior to 2008.  (Doc. No. 9 at 8).

4

**1.  State Court Decision**

5

In rejecting Petitioner's sufficiency claim, the Fifth Appellate District court found as

6

follows:

7

**Sufficient Evidence to Support Gang Enhancement on Murder Conviction**

8

9

10

Appellant finally contends the jury's finding on the gang allegation on count 1 must be reversed because there was insufficient evidence that LNS gang members had engaged in a pattern of criminal gang activity before the murder of Ibarra, the victim in count 1.  We disagree.

11

*Standard of Review*

12

13

14

15

16

17

18

19

"When we review a challenge to the sufficiency of the evidence to support a conviction we apply the substantial evidence standard. Under that standard the reviewing court examines the entire record to determine whether or not there is substantial evidence from which a reasonable jury could find beyond a reasonable doubt that the crime has been committed.  In reviewing that evidence, the appellate court does not make  credibility determinations and draws all reasonable inferences in favor of the trial court's decision.  We do not weigh the evidence but rather ask whether there is sufficient reasonable credible evidence of solid value that would support the conviction.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578 ….)"  (*People v. Russell* (2010) 187 Cal.App.4th 981, 987–988.) The jury's finding on enhancement allegations are reviewed under the same standard.  (*People v. Rivera* (2019) 7 Cal.5th 306, 331.)

20

*Predicate Offenses*

21

22

23

24

25

26

27

28

The Legislature enacted the California Street Terrorism Enforcement and Prevention Act (STEP Act) expressly "to seek the eradication of criminal activity by street gangs."  (§ 186.21.)  One component of the statute is a sentence enhancement for felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  A "criminal street gang" is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [§ 186.22, subd. (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (f).)  A "pattern of criminal gang activity" means the commission of, attempted commission of, or

34

conviction of two or more of the enumerated offenses, referred to as "predicate offenses," provided at least one of these offenses occurred after the effective date of the STEP Act and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more person.  (§ 186.22, subd. (e).)

To prove the predicate offenses by LNS gang members, the prosecutor presented evidence that Armando Flores had been convicted of first degree burglary, assault with force likely to produce great bodily injury, dissuading a witness, plus a gang enhancement, based on conduct that occurred on or about August 16, 2004, and that Jesus Palos had been convicted of assault with a deadly weapon, plus a gang enhancement, based on conduct that occurred on or about March 13, 2005.  Officer Moreno, the gang expert, testified that, in his opinion, Flores was a "gang member" and Palos an "LNS Norteño."  Officer Moreno explained that, sometime around 1992, LNS and NSL merged as one gang and were "interchangeable."

Appellant argues there was insufficient evidence that Flores was an LNS gang member because Officer Moreno identified him only as a non-specified "gang member," not an LNS member.  At trial, Corporal Rose was asked if Flores and Palos were "both from the same gang."  Rose responded, "North Side Lindsay."  The prosecutor then asked, "That was described by Detective Moreno?"  Rose replied, "Yes."

Appellant argues, for the first time in his reply brief, that Corporal Rose's  response was case-specific testimony in violation of *People v. Sanchez* (2016) 63 Cal.4th 665, because Rose based his answer on Officer Moreno's testimony that Flores was an NLS member, but that Moreno had never identified Flores as an NSL member.  However, the very next question by the prosecutor – "About how they split apart and came back together?" – seems to indicate that Rose was not basing his opinion that Flores was an NLS member on Moreno's testimony, but on his own knowledge of Flores as an NLS member and he was instead responding on the lack of distinction between the NSL and LSN, as earlier testified to by Moreno.

Drawing all reasonable inferences in favor of the verdict, we find there is sufficient evidence that members of appellant's gang had engaged in a pattern of criminal activity before Ibarra's murder in 2008, and we reject appellant's claim to the contrary.

(Doc. 16-1 at 2108-10).

### 2.  Analysis

Petitioner argues the state appellate court's decision was contrary to clearly established federal law because while the court "drew every reasonable inference in favor of the verdict, finding sufficiency of evidence that members of petitioner's gang engaged in criminal activity

1  prior to 2008," "these conclusions were in fact misinterpretations of the record."  (Doc. No. 9 at

2  8).

3          The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from

4  conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the

5  crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard

6  for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v.*

7  *Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing

8  the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

9  found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in

10  original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

11  *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

12  rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's

13  verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed

14  with the jury").

15          The *Jackson* standard "must be applied with explicit reference to the substantive elements

16  of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

17  408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

18  elements of the offense and then turn to the federal question of whether any rational trier of fact

19  could have found the essential elements of the crime supported by sufficient evidence beyond a

20  reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

21          Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

22  under a "twice-deferential standard."  *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

23  the Supreme Court:

24          First, on direct appeal, "it is the responsibility of the jury−not the
         court−to decide what conclusions should be drawn from evidence
25          admitted at trial. A reviewing court may set aside the jury's verdict
         on the ground of insufficient evidence only if no rational trier of
26          fact could have agreed with the jury." And second, on habeas
         review, "a federal court may not overturn a state court decision
27          rejecting a sufficiency of the evidence challenge simply because the
         federal court disagrees with the state court. The federal court

28

36

1    instead may do so only if the state court decision was 'objectively
2    unreasonable.' "

3    *Coleman*, 566 U.S. at 651.

4    California Penal Code § 186.22(b) provides for a sentencing enhancement when an

5    individual is convicted of a felony committed for the benefit of, at the direction of, or in

6    association with a criminal street gang, with the specific intent to promote, further, or assist in

7    criminal conduct by gang members.  "Criminal street gang" is statutorily defined as an "ongoing,

8    organized association or group of three or more persons, whether formal or informal" who have

9    as at least one of its "primary activities" the commission of one or more crimes specified

10   elsewhere in the statute, who share a common name or common identifying sign or symbol, and

11   whose members collectively engage in, or have engaged in, a pattern of criminal gang activity.

12   Cal. Penal Code § 186.22(f).  The version of the statute in effect at the time of Petitioner's

13   conviction defined a pattern of criminal gang activity as:

14   the commission of, attempted commission of, conspiracy to
     commit, or solicitation of, sustained juvenile petition for, or
15   conviction of two or more of the [listed] offenses, provided at least
     one of these offenses occurred after [September 26, 1988], and the
16   last of those offenses occurred within three years of the prior
     offense, and the offenses were committed on separate occasions, or
17   by two or more persons[.]

18   Cal. Penal Code § 186.22(e) (2017).[3]  The listed offenses include assault with a deadly weapon

19   and unlawful homicide or manslaughter.  Cal. Penal Code § 186.22(e)(a) & (c).

20   Here, the state court, although not citing directly to *Jackson*, applied the *Jackson* standard

21

22   ---

[3] Although not addressed by the parties, the undersigned notes that the current version of the
statute adds additional requirements that the last predicate offense occurred "within three years of
23   the date the current offense is alleged to have been committed," and the offenses commonly
benefited a criminal street gang in a way that was more than reputational.  Cal. Penal Code §
24   186.22(e)(1).  These changes, which became effective on January 1, 2022, apply retroactively to
"all cases that [were] not yet final as of the legislation's effective date."  *People v. Tran*, 13 Cal.
25   5th 1169, 1206-07 (2022).  In this context, a judgment is final when the criminal proceeding
reaches final disposition in the highest court authorized to review it.  *People v. Lopez*, 17 Cal. 5th
26   388, 397 (2025).  Here, Petitioner's conviction became final when the California Supreme Court
denied his petition for review on September 11, 2020, over one year before the statutory changes
27   became effective.  (Doc. 16-1 at 2192).  Accordingly, he is not entitled to relief based on the
subsequent statutory changes.
28

37

1  and reasonably determined there was sufficient evidence to support the enhancement.  (Doc. 16-1

2  at 2108-09).  While Petitioner asserts the state court's conclusion was based on a

3  misinterpretation of the facts, the state court correctly cited Officer John Moreno's testimony

4  regarding prior convictions of Armando Flores, a gang member, for assault with a deadly weapon

5  on August 16, 2004, and Jesus Palos, an LNS gang member, for attempted murder on March 13,

6  2005.  (Doc. 16-1 at 1176-78).  Moreno further testified that Petitioner was an active LNS gang

7  member.  (*Id.* at 1181).  Additionally, Officer Jeremy Rose testified that Flores's and Palos's

8  convictions were gang related; both Flores and Palos were members of the North Side Lindsey

9  gang; Petitioner was an active participate of Lindsay North Side; and "LNS" and "NSL" "are

10  interchangeable."  (*Id.* at 1485-87).

Viewing this evidence in the light most favorable to the prosecution, it was objectively

12  reasonable for the state appellate court to determine that there was substantial evidence to support

13  a pattern of gang activity to warrant the gang enhancement.  As such, the state appellate court's

14  rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable

15  application of, clearly established Supreme Court precedent, nor an unreasonable determination

16  of the facts.  The undersigned recommends that ground three be denied.

### V.  CERTIFICATE OF APPEALABIILTY

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

19  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

20  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

21  district court to issue or deny a certificate of appealability when entering a final order adverse to a

22  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

23  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

24  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

25  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

26  his constitutional claims or that jurists could conclude the issues presented are adequate to

27  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

28  *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

1   the denial of a constitutional right, the undersigned recommends that the court decline to issue a

2   certificate of appealability.

3          Accordingly, it is **RECOMMENDED**:

4          1.   Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

5               9); and

6          2.   Petitioner be denied a certificate of appealability.

7                                    **NOTICE TO PARTIES**

8          These Findings and Recommendations will be submitted to the United States District

9   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

10  after being served with a copy of these Findings and Recommendations, a party may file written

11  objections with the Court.  *Id*.; Local Rule 304(b).  The document should be captioned,

12  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

13  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

14  wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

15  CM/ECF document and page number, when possible, or otherwise reference the exhibit with

16  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

17  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

18  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

19  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

20

21  Dated:    __April 23, 2025__

22                                      HELENA M. BARCH-KUCHTA
                                        UNITED STATES MAGISTRATE JUDGE
23

24

25

26

27

28